# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

KARAN GILDAY,                           )
                                        )
      Plaintiff,                       )
                                        )
        v.                          )    Case No. 1:09-cv-0229-TWP-TAB
                                        )
KENRA, LTD., IMPERIAL CAPITAL          )
GROUP LTD., JONATHAN D. SHERMAN, )
and TIMOTHY J. McMEEKAN,                )
                                        )
      Defendants.                      )

## ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter comes before the Court on Defendants', Kenra, Ltd., Imperial Capital Group Ltd. ("ICGL"), Jonathan D. Sherman ("Sherman"), and Timothy J. McMeekan ("McMeekan") (collectively "Defendants" or "Kenra"), Motion for Summary Judgment [Dkt. 78]. Plaintiff, Karan Gilday ("Gilday"), filed suit in this Court alleging the following claims: (1) tortious interference with a business relationship; (2) discrimination in violation of both Title VII of the Civil Rights Act of 1964 ("Title VII") and the Age Discrimination in Employment Act of 1967 ("ADEA"); (3) retaliation in violation of Title VII and ADEA; (4) wrongful termination; and (5) an alternative claim under the Employee Retirement Income Security Act of 1974 ("ERISA"). For the reasons stated herein, the Court **GRANTS** Defendants' Motion for Summary Judgment on Plaintiff's claims.

## I. EVIDENTIARY ISSUES

As an initial matter, in a separate Motion to Strike [Dkt. 90], Gilday asserts that certain statements in Defendants' affidavits and deposition testimony should be stricken and removed from consideration on the basis of inconsistent testimony and hearsay. It is well settled that when

an affidavit contradicts previously submitted deposition testimony, a court may use the deposition testimony and disregard the affidavit in evaluating a motion for summary judgment. *Holman v. Revere Elec. Supply Co*., 2005 WL 3046251, at *1 (7th Cir. 2005) ("The well-established rule is that affidavits in conflict with prior sworn testimony should be disregarded."). Affidavits offered in opposition to summary judgment must be based on personal knowledge setting forth such facts as would be admissible in evidence and acts asserted by a party that are merely conclusory or hearsay cannot serve as the basis for supporting or defeating an otherwise proper motion for summary judgment. *Payne v. Pauley,* 337 F.3d 767, 772 (7th Cir.2003). To a large extent, the statements raised by Gilday are addressed by the summary judgment standard itself.[1] The Court will however, disregard those statements made in affidavits or depositions which constitute impermissible hearsay, opinions unsupported by facts, draw legal conclusions or contradict prior deposition testimony.

## II.  LEGAL STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure governs summary judgment. Under Rule 56(c), summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact" and that Defendants are entitled to a judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  As articulated by the Supreme Court, "summary judgment is not a disfavored procedural shortcut, but rather an integral part of the federal rules as a whole." *Id*. at 327. The party moving for summary judgment bears the initial burden of informing the district court of the basis for its motion. *Celotex*, 477 U.S. at 323. When

---

[1] In ruling on a motion for summary judgment, the admissible evidence presented by non-movant must be believed and all reasonable inferences must be drawn in her favor. *Zerante v. DeLuca*, 555 F. 3d 582, 584 (7th Cir. 2009).

the moving party produces proper support of its motion, the burden then shifts to the non-movant. It is not enough for the non-movant merely to raise factual arguments that cast "some metaphysical doubt as to the material facts." *Baker v. Elmood*, 940 F. 2d 1013 (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). A party who bears the burden of proof on a particular issue … must affirmatively *demonstrate*, through specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007) (citation omitted) (emphasis added).

## III.  BACKGROUND

The following statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light reasonably most favorable to plaintiff as the non-moving party. *Zurwell v. Colgate-Palmolive Co.*, 2008 WL 2906712, at *1 (S. D. Ind. July, 23 2008); *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).

### A.  Company History and Acquisition

Kenra, LLC was a family-owned business located in Indianapolis, Indiana that made and sold hair care products. On February 1, 2007, Kenra, LLC sold substantially all its assets to Kenra ("Kenra"). Kenra Holdings, Ltd. ("Holdings") is the majority owner of Kenra. Holdings is wholly owned by SalonProf Holdings (Canada) Inc. ("SalonProf"), which is owned by various corporations, limited partnerships, and trusts (collectively "Investors").

At the time of the acquisition, Jeffrey Rosenthal ("Rosenthal") was on the Kenra board and Jonathan D. Sherman ("Sherman") served as a vice president at Imperial Capital. Rosenthal and Sherman are Directors of Kenra and Holdings. Rosenthal is President of Holdings, and

Sherman is Secretary for Kenra and Vice President and Secretary for Holdings. Rosenthal is also a Director at Imperial Capital Group Ltd. ("ICGL"),  a corporate entity that raises capital and creates holding companies to acquire companies for groups of investors. ICGL is not one of the Investors, is not a direct or indirect owner of SalonProf, Holdings or Kenra, and is not the parent or holding corporation for any other entity, and there is no other overlap of the directors or employees of ICGL and Kenra.

### B.  History and Early Performance

Gilday was Human Resources Director for almost ten years at Kenra, LLC and eight months at Kenra, Ltd. Gilday reported to Steve Nerney ("Nerney"),  the Chief Operating Officer of Kenra, LLC and then Kenra, Ltd., for a total of five years. During that time, Gilday received excellent performance reviews. Gilday also received numerous thank you cards from Nerney for her work,  including organizing company summer picnics, holiday parties, and an employee rewards program titled the rewards and recognition committee ("R&R committee"). Nerney testified that when he asked Gilday for information she was thorough, paid attention to detail, and responded promptly. Gilday could be trusted with confidential information both at Kenra, LLC and Kenra, Ltd. Gilday also had good working relationships with her coworkers.

Gilday received a raise from Nerney in January 2007; Nerney also thanked Gilday for her *"great job"* done *"during these turbulent times."* Other management at Kenra shared Nerney's praise for Gilday.  Paul Browning, Vice President of Research and Development for Kenra, LLC and Kenra, Ltd. ("Browning"), stated that Gilday was *"completely professional," "knowledgeable," "accessible and available to all employees,"* and *"adept at instilling and maintaining a positive work environment."* Browning worked with Gilday for almost 10 years, until his termination in June, 2008. The other "senior managers" of Kenra, Ltd., some of whom

worked with Gilday between six to ten years, had no real substantive comments regarding Gilday's performance. Sherman, who is a vice president at Imperial Capital, and was Director of Kenra, Ltd., testified to having met Gilday briefly early on and that he had "no real impression."

### C. Gilday and Ludwig

At the time of her termination, Gilday had a ten plus year history of fielding and handling complaints of sex and age discrimination at Kenra - mostly complaints regarding the Vice President of the Kenra brand, Patrick Ludwig ("Ludwig"). Over the course of her employment with the Defendants, employees raised concerns to Gilday about Ludwig and his behavior. Employees also expressed a fear of retaliation for complaining about anything. The record indicates that Ludwig used offensive and sexist language on a more than sporadic basis and that Gilday repeatedly brought her concerns to upper management. In addition to these more generalized complaints regarding Ludwig's behavior, Carolyn Schutz, a former employee, overheard Ludwig's negative statements regarding the hiring of old women and women over forty. Additionally, when Gilday recruited for Ludwig he expressed his desire that the candidate be "young." Gilday made management aware of these incidents and others.

One particular instance made known to Kenra regarded a voice mail ("the Voicemail") left by Ludwig, sent to the wrong employee, in which he stated:

> …Bro'…We need more chicks? Well, no we don't. We need less of that dumb ass, whatever her name is, O'Donnell, and less of O'Brien. They are collectively the biggest pieces of shit on the planet….And O'Brien is wearing me out, Bro'. So, we need to have a conversation, 'cause I'm gonna light that motherfucker up at lunch that we're going to. And, say, "You know what? I'm done which ch[y]ou.

Ludwig denied having been disciplined or reprimanded in any way for the Voicemail. Nerney, however, testified that he told Ludwig the Voicemail contained profanity and inappropriate comments, and that he needed to realize he had made a mistake. Moreover, Nerney

sent an email to Ms. Schutz that Ludwig had been *"seriously counseled"* at the advice of legal counsel.

Ludwig was terminated in August 2009, shortly after Gilday produced a transcript of the Voicemail in document production. Timothy J. McMeekan ("McMeekan"), Kenra's current CEO, claims Ludwig was fired because *"the market passed him by,"* despite Ludwig receiving a raise eight months earlier. Upon termination, Ludwig authenticated a Settlement Agreement and Release ("Settlement"). Through the Settlement, Ludwig received severance pay contingent upon his compliance with certain obligations, including a non-disparagement clause. Ludwig was also instructed not to talk about his termination and pursuant to the Settlement, received compensation for his assistance with the Gilday litigation – including payment of attorney's fees.

### D. Gilday and McMeekan

On July 9, 2007, McMeekan became CFO of the majority Kenra. It was observed that upon commencement of his duties as CFO, McMeekan established a positive rapport with Ludwig. Ludwig disparaged Gilday to Sherman, Rosenthal, Gordon, and McMeekan—though Ludwig claims to have had virtually no contact with Gilday. On his first day, there were tense moments between McMeekan and Gilday. McMeekan was not satisfied with the job Gilday did acclimating him to Kenra. However, Gilday did speak with him and orient him. McMeekan could not recall how long she spent with him, what time of day it was, or what he and Gilday discussed. He recalled merely that he was dissatisfied with his orientation. McMeekan later admitted that he did not know if anyone had instructed Gilday to talk with McMeekan.[2] Gilday was also blamed for not "on-boarding" consultant Ben Staub. McMeekan admitted, however, that he did not recall telling Gilday when Staub was starting or whether he had ever discussed

---

[2] Ultimately, Nerney admitted responsibility for this lack of communication and apologized to McMeekan.

proper "on-boarding" (e.g. orientation) procedures with Gilday. Ultimately, Gilday and other employees felt that McMeekan's approach to management was far from team building. A former employee even went as far as to say *"[I]f you disagreed with [McMeekan] even part of the time, he would most likely...remove you from the Company."*

On August 20, 2007, McMeekan met with Sherman, Ludwig, and Cheryl Davis and acknowledged that it would become his responsibility to terminate Gilday after Nerney was given notice of his termination the next day. On August 21, 2007, Gilday met with McMeekan and Sherman and was informed of Nerney's termination. Gilday challenged McMeekan regarding Nerney's insurance benefits. When McMeekan said Nerney would be terminated, Gilday explained that she would need to issue a COBRA notice and that she could not keep Nerney on Kenra's insurance plan unless he was working at least 30 hours per week. McMeekan responded with misinformation, explaining that Nerney would continue to work full time and that *"this isn't the time or place to discuss this."*

Gilday's next notable encounter with McMeekan involved the termination of Cathy Merrill-Smith ("Merrill-Smith"). McMeekan had a locksmith change the lock on Gilday's office to retrieve a copy of Merrill-Smith's job description while Gilday was on vacation for her 48th birthday. On or around September 10, 2007, shortly after Merrill-Smith's termination, Gilday noticed that the Kenra lobby was filled with young females and was told the females were waiting to be interviewed by Ludwig to fill Merrill-Smith's recently vacated position. When Gilday expressed concern to McMeekan, he told her that Ludwig wanted to hire a 'Jenny Boso type.' Jenny Boso was a 23 year old hourly Kenra employee. Kenra also placed an ad for the open position on Careerbuilder.com. Kenra claims the use of the word "manager" was a mistake and that Kenra was looking for a customer service *associate*.

An additional incident involving McMeekan and Gilday surrounded the handling of an alleged disruption by employee Michelle Johnson ("Johnson") on September 12, 2007. McMeekan had no real testimony as to what happened, besides the fact that Gilday had *"misjudge[ed]"* the situation and that he disagreed with her. McMeekan claimed that after speaking to the employees, he determined that Gilday was *"heavy-handed"* and used a *"punitive approach"* with Johnson. However, McMeekan later admitted that Johnson was not disciplined by Gilday in any way.

Also on September 12, 2007, McMeekan held a "counseling meeting" with Gilday to "address the overall approach and objectives of the human resources department and begin to counsel Gilday." During the meeting, Gilday told McMeekan that she had learned that he was handling Dave Gordon who was terminated on August 25, 2007. Like Nerney, Gordon was prohibited from performing any work on behalf of Kenra, Ltd., including sending emails, answering voicemail, and coming to the Kenra offices. Gilday again stated that Nerney and Gordon could not be working full-time and that she thought McMeekan was lying to her. McMeekan responded that: *"They're working full-time! Do you need to see the list of things they're doing?"* That day, McMeekan sent an email to Gilday instructing her to seek his permission before contacting legal counsel.

Further, McMeekan told Gilday that certain employees thought her "unapproachable," namely Robbyn Eddington, Browning, Charlie Huxhold, and Diane Buechlein, and that *"Patrick [Ludwig] could not work with her."* However, Huxhold and Eddington denied speaking to McMeekan about Gilday and Browning denied that McMeekan ever asked him about Gilday.

### E.  Gilday Email and Termination

On July 23 and 24, 2007 a strategy meeting was held. Sherman, McMeekan, Ludwig, Nerney, Gordon, and Alan Stockman were all in attendance. Gilday was identified for termination at the meeting by 'all' Kenra's senior managers; however, it is unclear exactly what occurred and what was said about Gilday. Gordon recalled that Gilday's name was raised as part of a discussion about outsourcing the department. Gordon did not recall any specific comments he made about Gilday's job performance. Nerney claims that while at this meeting, he explained to other attendees that he had to shield Gilday from other employees. Gordon, however, testified that he did not recall Nerney making any remark about needing to run interference for Gilday. Nerney also testified that he discussed possible cost-savings measures with Sherman prior to ICGL's acquisition of Kenra, LLC. Among those changes discussed, Nerney identified the human resources department for possible outsourcing. Sherman remembered this too. Other than Gordon, the other "senior managers" remembered very little detail about the discussion on Gilday. None could remember discussing any of Gilday's performance issues. At the time of the meeting Nerney was looking to bid for the Elasta QB® and plant operations. This new organization would be too small to have a separate human resource department. Nerney confirmed, however, that he contacted Gilday in the fall of 2007 about the possibility of working with him at his new company.

Defendants contend that Nerney left the July 23 and 24, 2007 strategy meeting with instructions to terminate Gilday. Nerney, McMeekan and Sherman all admit, however, that no deadline was set for Gilday's termination. On August 2, 2007, just days after the strategy meeting, Nerney sent an email to Sherman informing him of four moves in progress, with no mention of Gilday. After this meeting, Kenra sent Gilday to various training seminars that

summer, and was set to publish a revised employee handbook with Gilday's signature on the cover page.

Gilday sent McMeekan an email on September 13, 2007 titled "9/12/07 Notification of Alleged Employment Issues." In the email, Gilday described the many different incidents of age and sex discrimination relating to Ludwig. Gilday also forwarded the email to Sherman, with a September 16, 2007 email outlining her problems with McMeekan and reiterating the insurance issue regarding Nerney's termination. Following Gilday's email complaints, Kenra hired Michael Murphy, a human resource consultant, to conduct an investigation. Murphy's "Confidential Report of Investigation" purports to investigate all the claims raised by Gilday, including retaliation, sex and age discrimination, and the insurance fraud issues. At Murphy's invitation, Gilday corrected several parts of Murphy's summary of her interview. Kenra contends that during the investigation period, McMeekan and Ludwig were not to have contact with Gilday, and vice versa. However, Ludwig has no recollection of this instruction.

On September 14, 2007, Sherman assured McMeekan *"I know that things seem not so great right now, but we are going to come out of this thing better and stronger on the other end."* On September 24, 2007, Sherman sent Gilday an email and scheduled her termination meeting for October 1, 2007. McMeekan also admitted that Sherman called him in September, said he had Murphy's report, which concluded that Gilday's claims were unsubstantiated, and was recommending Gilday's termination.

On September 28, 2007, a specially formed "Governance & Nominating Committee of the Board of Kenra, Ltd and Kenra, Holdings, Ltd." (the "Governance Committee"), consisting of Sherman and Rosenthal, voted to terminate Gilday's employment. Gilday is the only employee ever fired by the Governance Committee. The Committee minutes provide that: "Upon

receipt of a written report from Michael Murphy, an investigator hired by Kenra, Ltd., pursuant to an investigation commissioned by Sherman, Jonathan Sherman moved and Jeffrey Rosenthal seconded a motion to terminate Karan Gilday, Director of Human Resources for Kenra, Ltd. on Monday, October 1, 2007." Sherman told Gilday that an impartial investigation regarding Gilday's discrimination allegations had concluded and nothing unlawful was found. As a result, there existed a difficult interface resulting in a troublesome disconnect. Sherman told her *"this was my decision,"* with the emphasis on the word "my." Nora Bammann was put in place by Resources Global, retained by McMeekan to fill Gilday's position. McMeekan announced Bammann's arrival with an inner-office memo on October 4, 2007, which introduced her as Interim Director of Human Resources to be in place for the next few months while Kenra searched for a permanent solution, with her contract expiring in December of 2007. After Bammann's departure, Babs Hefly was put in her place. Next, Christine Bolanis was hired as a Kenra employee. Bolanis was only 35 years old.

Additional facts will be added as needed.

## IV.  DISCUSSION

### A.  Discrimination Claim in Violation of Title VII and/or ADEA

Title VII makes it unlawful for employers "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1).  ADEA prohibits intentional discrimination against individuals older than age 40. 29 U.S.C. § 621(b). *See Atanus v. Perry*, 2007 WL 257679, at *3 (N. D .Ill. January 24, 2007) (internal citations omitted). To survive a summary judgment motion on age and sex discrimination claims under the ADEA and Title VII, a plaintiff must

establish that an employer violated these prohibitions by presenting either direct or indirect evidence of discriminatory intent. *See Naik v. Boehringer Ingelheim Pharmaceuticals, Inc*., 627 F.3d 596, 599 (7th Cir. 2010); *La Montagne v. American Convenience Products, Inc.* 750 F.2d 1405, 1409 (7th Cir.1984).

i. Direct Method

"The focus of the direct method of proof is ... whether the evidence 'points directly' to a discriminatory reason for the employer's action." *Atanus v. Perry*, 520 F.3d 662, 672 (7th Cir. 2008). The presented facts can take the form of direct or circumstantial evidence. "Direct evidence essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus." *Rogers v. City of Chi*., 320 F.3d 748, 753 (7th Cir. 2003). If plaintiff does not have direct evidence, she may rely on a "convincing mosaic" of circumstantial evidence as direct proof of discrimination. *Sattar v. Motorola, Inc.*, 138 F.3d 1164, 1170 (7th Cir. 1998). Circumstantial evidence used to construct a "convincing mosaic" can include suspicious timing, ambiguous oral or written statements, behavior toward or comments directed at other employees in the protected group, and inconsistent explanations or behavior. *See Sun v. Bd. of Trs. of Univ. of Ill.*, 473 F.3d 799, 812 (7th Cir. 2007); *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994); *Nanavaty v. City of Indianapolis*, 2001 WL 1781924, at *12 (S.D. Ind. Dec. 19, 2001). However, the circumstantial evidence in the convincing mosaic "must point directly to a discriminatory reason for the employer's action." *Koszola v. Bd. of Educ. of Chi.*, 385 F.3d 1104, 1109 (7th Cir. 2004).

Kenra argues that Gilday has no evidence that anyone considered age or gender in the decision to terminate her employment. Kenra cites to the fact that neither her age nor gender were mentioned when Gilday was terminated and that she has presented no evidence pointing

"directly" to the conclusion that her sex or age was the "reason for her termination." Gilday thoroughly recited the state of the law regarding direct method of proof; she however, offered little outside of conclusory statements such as *"there are simply too many coincidences, which combine here to form the perfect storm of discrimination—suspicious timing, ambiguous statements made by Kenra and Imperial executives during Gilday's employment and in connection to this lawsuit, the Defendants' behavior toward other members of statutorily protected groups, and the constantly-changing tale the Defendants have spun"* [Dkt. 153 at 46].

However, the record provided by Gilday herself paints a picture of turbulent interactions with Kenra's new management – McMeekan – well before her September 2007 email was sent. The identified isolated statements made by Ludwig before McMeekan's tenure do not rise to the level of persuasive circumstantial evidence sufficient to constitute direct proof of discrimination. The Court finds the proffered direct evidence lacking, and will move to the indirect method of proof.

ii. Indirect Method

To prove a *prima facie* case of discriminatory intent through the indirect method, the Plaintiff employee must show that: (1) she is a member of the protected class; (2) she was performing well enough to meet her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees not in her protected class were treated more favorably.[3] *Hildebrandt v. Illinois Department of Natural Resources*, 347 F.3d 1014, 1030 (7th Cir. 2003). If the plaintiff is able to establish a *prima facie* case of discrimination, the burden shifts to her employer to offer a nondiscriminatory reason for the discharge; if the employer is able to do so, the burden shifts back to plaintiff to submit evidence

---

[3] Elements one and three are uncontested and will not be addressed by the Court.

showing that the nondiscriminatory reason was a pretext for discrimination. *See Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 538 (7th Cir. 2007). A plaintiff demonstrates pretext by showing the employer's proffered nondiscriminatory reason is a lie and the real reason is based on discriminatory intent. *See, e.g., Fischer v. Avanade, Inc.*, 519 F.3d 393, 403 (7th Cir. 2008).

### 1. *Legitimate Job Expectations*

Defendants contend that Gilday was not meeting Kenra's legitimate business expectations at the time of her termination and cite to the following contentions as support: (1) during a senior level management meeting, Gilday received less than stellar commentary; (2) McMeekan concluded that Gilday was ineffective and part of the problematic Kenra culture; and (3) the post-termination audit report indicated that Gilday was not performing her job to Kenra's expectations.

In turn, Gilday refers to her complete employment history. Gilday contends that she was meeting Kenra's legitimate expectations as follows: (1) positive performance reviews given by Nerney in 2004 and 2005 while working for Kenra, LLC and under different management; (2) Nerney's agreement to provide a post termination recommendation for her; and (3) positive feedback from other employees and managers. The Court; however must evaluate whether she was meeting her employer's legitimate expectations at the time of her termination. *See Luckie v. Ameritech Corp.,* 389 F.3d 708, 715 (7th Cir. 2004). "[A]lthough in some circumstances, previous employment history may be relevant and probative in assessing performance at the time of [the employment action]; its limited utility must also be recognized." *Moser*, 406 F.3d at 901 (quoting *Fortier v. Ameritech Mobile Communications, Inc.*, 161 F.3d 1106, 1113 (7th Cir. 1998)). Gilday's previous evaluations by themselves do not rise to the level needed to establish

that an employee was meeting the employer's legitimate expectations. However, they do shed light and provide context, particularly given the circumstances of a recent acquisition.

Gilday offered additional evidence that she was meeting Kenra's legitimate expectations: (1) on the eve of the acquisition - six months before the July meeting - Gilday received a raise from Nerney; (2) Nerney thanked Gilday for her *"great job"* done *"during these turbulent times,"* meaning the acquisition; and (3) other management at Kenra, through deposition testimony, shared positive reviews of Gilday; and those that did not have positive remarks, had no real substantive comments regarding Gilday's performance. Kenra cites to the July 2007 senior management strategy as evidence that Gilday was not meeting Kenra's legitimate expectations. Particularly, that *"each senior manager at the July 2007 meeting said he would not hire or retain Gilday if he left to form a new business or stayed with the stand-alone Kenra."* [Dkt. 80 at 29]. Kenra further points to the fact that McMeekan had a negative opinion of Gilday from his first day and found that she was "ineffective and part of the very problematic Kenra silo culture."

However, during McMeekan's deposition testimony there were many instances where he recalled being unsatisfied, or left with the impression that Gilday was ineffective, yet stated repeatedly when asked for specifics that he 'did not recall.' Outside of conclusory statements, there is a glaring lack of evidence related to these 'deficiencies.' Ultimately, Kenra's *statements and impressions* – unsupported by hard evidence that she was not meeting the legitimate expectations of Kenra's management – fall short.

Lastly, Kenra cites to the post-termination audit report as evidence that Gilday was not performing her job to Kenra's expectations. However, post-termination evidence alone does not necessarily evidence that during Gilday's employment she was not meeting Kenra's legitimate

expectations. Evidence of post-termination audit would provide persuasive support if corroborated by specific deficiencies articulated by Kenra. But as stated earlier, Kenra has supplied only an 'impression' of ineffectiveness on the part of Gilday. Ultimately, as Gilday stated, *"[I]f problems existed, there would be a record."* The Court, therefore, finds that the evidence presented raises a material issue of fact as to whether Gilday was meeting her employer's legitimate expectations.

## 2. *Similarly Situated Persons*

Generally, to show that an employee is similarly situated, it must be established that "the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Radue v. Kimberly-Clark Corp*., 219 F.3d 612, 617–18 (7th Cir. 2000). Kenra claims that there are no similarly situated employees and urges the Court to alter its analysis accordingly.

While a similarly situated employee "need not be identical," such an employee must have been comparable in all material respects. This typically means that the alleged comparator held the same type of job, reported to the same supervisor, was subject to the same standards and rules, had comparable experience and qualifications, and engaged in the same conduct without being subject to the same level of discipline. *Young v. Digger Specialties, Inc*., 2010 WL 3940455, at *5 (N. D. Ind. October 5, 2010). Additionally, when a plaintiff claims to have been disciplined more harshly than other employees, the court must consider whether the proffered 'similarly situated' employees had any other differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them. *Everroad v. Scott Truck Systems,*

*Inc*., 604 F.3d 471, 479 (7th Cir. 2010); *Antonetti v. Abbott Labs.,* 563 F.3d 587, 592 (7th Cir. 2009)).

The Seventh Circuit has found that the examination using the McDonnel Douglas framework need not be rigid or inflexible in its application. *Pantoja v. American NTN Bearing Mfg. Corp*., 495 F. 3d 840 (7th Cir. 2007). In a termination case, for example, an inflexible rule requiring plaintiff to point to a similarly situated comparator would automatically doom a suit brought by, for example, any employee who is the sole occupant of a particular job class at her employer. *Id*. at 846. The Seventh Circuit has stated that if one's replacement is of another race, sex, or age, this fact may help to raise an inference of discrimination, but it is neither a sufficient nor a necessary condition. *Carson v. Bethlehem Steel Corp*., 82 F.3d 157, 159 (7th Cir. 1996). Kenra cites to Nerney and Gordon and their terminations as evidence that Kenra made termination decisions based on performance, not age or gender. Kenra's position is unpersuasive as they do not proffer evidence as to qualifications, experience, or specific conduct to rebut Gilday's argument that Nerney and Gordon were involved in managing her and allegedly involved in her termination.

The Court will now address Kenra's replacement for the position of Human Resources Director. Kenra initially replaced Gilday with a female over 40, then subsequently replaced that person with another woman, and ultimately hired a woman older than Gilday to fill the Human Resources Director position. Gilday urges the Court to consider only the replacement that was brought on as a non-temporary Kenra employee. Gilday, however, cites no caselaw supporting this interpretation. Because there has been no evidence to suggest that the replacement of Gilday by a woman over forty was to cloak or disguise the intent to replace Gilday with an employee of a different age or gender, the Court finds insufficient facts to raise an inference of retaliation

under either the direct and indirect method of proof and therefore summary judgment on the issue of discrimination is **GRANTED**.

### B. Retaliation Claim

In both the Title VII and ADEA context, Gilday may pursue a retaliation claim under the direct and indirect methods of proof. The Court will address both in turn.[4]

#### i. Direct Method

To prove retaliation under the direct method, the plaintiff must present evidence of: (1) a statutorily protected activity; (2) an adverse action; and (3) a causal connection between the two. *Turner v. The Saloon, Ltd*., 595 F.3d 679, 690 (7th Cir. 2010) (quoting *Burks v. Wis. Dep't of Transp*., 464 F.3d 744, 758 (7th Cir. 2006)). For the third element of retaliation under the direct method of proof, an employee can rely on two types of evidence to show that the protected activity motivated the employer's action: "direct evidence" or "circumstantial evidence." *Lewis v. School Dist. # 70,* 523 F.3d 730, 742 (7th Cir. 2008).

Circumstantial evidence comes in three flavors: (1) suspicious timing; (2) evidence that similarly situated employees were treated differently; and (3) evidence that the employee did not deserve the termination and that the employer's reason for the termination is a pretext for discrimination. *Crye v. Caterpillar, Inc*., 2008 WL 5111349, at *4 (N.D.Ind. December 03,

---

[4] Because the Court has already found there to be a genuine issue of fact as to whether Gilday was meeting Kenra's legitimate expectations at the time of her termination, the Court will not address this in its discussion.

Additionally, the Court need not address "adverse action" as Defendants have not disputed that Gilday suffered an adverse employment action by being terminated.

The Court therefore addresses the following only: statutory protected activity and causal connection of the direct method and treatment of similarly situated employees of the indirect method.

2008); *Volovsek v. Wis. Dep't of Agric., Trade, & Consumer Prot.,* 344 F.3d 680, 689-690 (7th Cir. 2003).

1. *Statutorily Protected Activity*

The first prong of both the direct and indirect methods of proof requires that a plaintiff engage in a statutorily protected activity. The anti-retaliation provision of Title VII protects two types of activities: "participation" and "opposition." 42 U.S.C. § 2000e-3(a) (2000).

> Opposition … refers to an employee's objecting to, or protesting against, an employer's discriminatory practices or policies - this "opposition" can take many forms, such as making formal or informal complaints to management, picketing, refusing to perform an act the employee believes violates Title VII, or organizing boycotts of a particular business.

39 Ariz. St. L.J. 1127, 1132 -1133 (Winter 2007).

The Court will begin its statutorily protected activity discussion with Defendants' assertion that Gilday's retaliation claims are precluded because at the time of her complaints, she held the position of Human Resource Director and thus her activity was done in the course of her employment capacity and duties. Gilday lists the following activities as evidence of asserting her statutorily protected activity: (1) Gilday reported Ludwig's improper behavior to Nerney and various Board members; (2) discussed the Voicemail first with a shareholder, and then with her supervisor; (3) challenged McMeekan and Ludwig's discriminatory hiring criteria; (4) pressed management about the "Jenny Boso type" comment; and (5) lodged formal complaints with the investigator. The Court finds that the nature of Gilday's activities went beyond her duties and responsibilities as the Human Resources Director, and extended to her individual capacity.

When Gilday acted, she was advocating for other employees and for herself individually—she was not just representing the company's interests or furthering Defendants' corporate goals. *See Atkinson v. Lafayette Coll.*, 653 F. Supp. 2d 581, 598–99 (E.D. Pa. 2009)

(add). Gilday asserts that she complained about the discrimination she faced as an individual, and when complaining about this discrimination, 'stepped outside her role as Human Resources Manager and went a step further than her job required by passing her complaints up the corporate tree and by ultimately triggering Murphy's third party investigation.' The Court agrees. Her actions were outside her general work as Human Resource Director and therefore, qualify as "protected activity."

Kenra next attacks Gilday's cited activities, stating that they were neither reasonably objective nor performed in good faith. In support of this contention, Kenra specifically cited to the September 2007 email stating that Gilday *"dredged up allegations of discrimination and retaliation based primarily on matters occurring many years before."* A plaintiff does not have to succeed on her discrimination claim to make out a *prima facie* case of retaliatory discharge; rather, the test is whether she reasonably believed in good faith that the practice she opposed violated Title VII. *Alexander v. Gerhardt Enterprises, Inc.*, 40 F. 3d 187, 195-96 (7th Cir. 1994). Viewed in the light most favorable to the non-movant, the Court finds that sufficient evidence has been presented to support the contention that Gilday reasonably believed that she was participating in protected activity.

### 2. *Causal Connection*

Gilday contends that the temporal proximity between the statutorily protected activity and the adverse employment action, and the statements made during Gilday's termination interview support an inference of the necessary 'causal link.' Gilday cites to *Culver v. Gorman & Company,* 416 F.3d 540, 546-47 (7th Cir. 2005) as support for her propositions regarding sufficient evidence to survive summary judgment. Specifically that: (1) *"Gilday only needs to show that her protected activity was one motivating factor in the adverse employment decision"*

and (2) *"When an adverse employment action follows some type of protected activity and the plaintiff can show the person who decided to impose the adverse action knew of the protected activity, the causation element of the prima facie case is typically satisfied."* [Dkt. 153].

The ruling in *Culver* must be viewed in light of the particular set of circumstances found in that case and not in such broad terms given by Gilday. In *Culver* the Seventh Circuit considered three pieces of circumstantial evidence sufficient to support an inference of causation for purposes of a *prima facie* case of employment discrimination: (1) the suspicious timing of plaintiff's termination only 72 hours after she engaged in protected activity, (2) defendant's sudden and "radical" reversal of its evaluation of plaintiff's performance, and (3) defendant's prior warning to plaintiff that having the meeting in which plaintiff engaged in protected activity would be "a mistake." *Kilgas v. Kimberly-Clark Corp.*, 2007 WL 3025825, at *8 (E.D.Wis. October 15, 2007). Gilday points to a statement allegedly made during her termination interview in which Sherman stated *"an independent investigation had been conducted, and there was no evidence of anything unlawful ... and that there now existed a difficult interface resulting in a troublesome disconnect"* as evidence of Kenra's unlawful discriminatory intent. Kenra contends that even if this statement was made, it does not establish the requisite causal connection.

To begin, Gilday's case is easily differentiated from the circumstances in *Culver*. Here, there was no warning regarding participating in statutorily protected activities, as stated by Gilday herself - her alleged complaints of discrimination spanned over the course of many years. Most notably, her actions (of reporting incidents that she felt to be unlawful or problematic) had not changed, instead the temperament of the company and management had changed. The

presented evidence suggests however, that the inability to integrate Gilday into Kenra's new management was the adverse employment action, rather than protected activity.[5]

    ii.  <u>Indirect Method</u>

Under the indirect methodology, an employee must demonstrate that she: (1) engaged in statutorily protected activity; (2) performed her job according to her employer's legitimate expectations; (3) despite meeting her employer's legitimate expectations, suffered a materially adverse employment action; and (4) was treated less favorably than similarly situated employees who did not engage in statutorily protected activity.[6] *Hilt-Dyson v. City Of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002). Absent direct evidence of retaliation, failure to satisfy any element of the *prima facie* case proves fatal to the employee's retaliation claim. *Id*. Therefore, if plaintiff has no evidence that a similarly situated male was treated more favorably, she cannot make out a *prima facie* case for retaliation under the indirect method. *Feaster v. Greyhound Lines, Inc.*, 2006 WL 751514, at *2 (7th Cir. 2006). Because the Court has already found that the treatment of similarly situated employees was not more favorable, the Court finds insufficient facts to support a *prima facie* claim of retaliation under the indirect method. Therefore summary judgment on Gilday's claim of retaliation is **GRANTED**.

### C. Tortious Interference With Employment Relationship

Gilday alleges that Sherman acted in the capacity of a third party from ICGL, and interfered with Gilday's relationship with her employer Kenra. Gilday further alleges that Sherman and McMeekan were acting outside their official capacity when they engaged in their

---

[5] During the relevant time of the Acquisition, the following people were identified as terminated: Gordon, Nerney, Gilday, Ludwig, Merrill-Smith, Bammann, Hefly, and Bolanis. The listed group represents upper management employees - white, black, male, and female.

[6] Each element has been discussed thoroughly in the preceding portions of the opinion. The Court therefore will not restate the analysis.

allegedly unlawful conduct. Gilday alleges that McMeekan gave her false information about Nerney and Gordon, restricted her access to lawyers, and performed exit interview, counseling, and severance duties she believed were hers.

The basic elements of tortious interference with a business relationship are: "(1) the existence of a valid relationship; (2) the defendant's knowledge of the existence of the relationship; (3) the defendant's intentional interference with that relationship; (4) the absence of justification; and (5) damages resulting from defendant's wrongful interference with the relationship." *Government Payment Service, Inc. v. Ace Bail Bonds*, 854 N.E.2d 1205, 1209 (Ind. Ct. App. 2006). The Indiana Supreme Court has held this tort requires some independent illegal action. *Brazauskas v. Fort Wayne-South Bend Diocese, Inc*., 796 N.E.2d 286, 291 (Ind. 2003). An at will employee may bring a claim for tortious interference provided that, in addition to demonstrating the standard elements of the tort, she is "prepared to show that the defendant interferer acted intentionally and *without a legitimate business purpose*." *Trail v. Boys and Girls Clubs of Northwest Indiana*, 845 N.E.2d 130, 138 (Ind. 2006) (emphasis added); *Bochnowski v. Peoples Fed. Sav. & Loan Ass'n,* 571 N.E.2d 282, 285 (Ind. 1991).

Kenra asserts that Gilday cannot prevail on her claims that McMeekan and Sherman tortiously interfered with her Kenra employment relationship because McMeekan and Sherman were not third party outsiders to the relationship, but were instead acting as agents on behalf of Kenra - acting in their capacity as members of Kenra's Board of Directors and its Governance Committee.

The tort of intentional interference exists to provide a remedy to those whose contracts and business relationships are disrupted by the wrongful acts of third parties. *See generally Trail*, 845 N.E.2d at 138-39 (Ind. 2006) (officers and directors of corporations are not personally liable

for tortious interference with the corporation's contracts unless they acted outside the scope of their official duties in causing the breach). The Indiana Court of Appeals has held that an action will not lie against a supervisor for tortious interference when the supervisor fires an employee, irrespective of the supervisor's motivations, if the supervisor possessed the authority to fire the employee as part of his ordinary duties. *Trail*, 845 N.E.2d, at 140 (Ind. 2006); *Martin v. Platt,* 386 N.E.2d 1026 (1979).

Because the Court has found in favor of Defendants regarding the alleged unlawful conduct, the Court finds that Gilday has not provided sufficient evidence to produce a triable issue of material fact regarding whether Sherman or McMeekan acted outside the scope of their official duties and tortiously interfered with a contract. Defendants' Motion for Summary Judgment of the Tortious Interference claim is **GRANTED**.

### D. ERISA Claim

Gilday's ERISA claim seeks remedies available under the civil enforcement section of 29 U.S.C. § 1132(a) and interference with protected rights section of § 1140.[7] Section 502(a)(3) provides plan beneficiaries and participants a means for seeking to recover benefits they were denied but to which they were entitled. 29 U.S.C. § 1132(a)(1). Gilday seeks equitable relief

---

[7] In relevant part, § 1132(a) states that a claim may be brought to: (A) to enjoin any act or practice which violated any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."

In relevant part, § 1140 states that: "It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this subchapter, section 1201 of this title, or the Welfare and Pension Plans Disclosure Act, or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this subchapter, or the Welfare and Pension Plans Disclosure Act." 29 U.S.C. § 1140.

under § 1132(a)(3)(B) to enjoin Defendants' practices violating ERISA, redress the practices to the extent there are actual or potential damages to plan participants, and to enforce any other provisions of this subchapter or the terms of the plan.

Kenra contends that Gilday has no claim under ERISA because of the following: (1) she was not denied any benefits; (2) she has no evidence that anyone else was denied benefits; (3) she has no evidence Kenra took any action in an effort to deny any benefits; and (4) the undisputed evidence shows that Kenra did not understand the nature or intended import of Gilday's complaints. Gilday attempts to circumvent denial on these terms by asserting that because she is a fiduciary, she is entitled to seek remedies available to other participants and beneficiaries of Kenra, Ltd.'s ERISA plans, and also is entitled to redress any ERISA violations of Defendants regarding the Kenra, Ltd. benefit plans. Kenra contends that ERISA provides no relief to Gilday for her difference in opinion over whether Nerney and Gordon were entitled to receive benefits during their notice period. Gilday's claims are both based on her assertion that she was terminated for objecting to *"violations of ERISA by defendants related to employee benefit plans and for her refusal to participate in such claims."*

Based upon the exhaustively pleaded facts in this case, Gilday's ERISA claim fails. To begin, the facts of this case do not involve a denial of a benefit to anyone; they involve the disputed granting of benefits. Additionally the Court finds the speculative nature of the alleged ERISA violations significant and the conspicuous lack of caselaw in Gilday's response telling. Finally, the activities proffered by Gilday involving her duties as Human Resource Director do not support a reasonable inference that they could rise to the level of a fiduciary.

The summary judgment time is the infamous put up or shut up time in a case. Ultimately, the Court finds that the evidence provided by Gilday falls short of supporting the inference that

these facts fall under the purview and protection of ERISA. Therefore the Motion for Summary Judgment on Gilday's alternative ERISA claim is **GRANTED**.

### E. Wrongful Termination

Although both parties have acquiesced to ERISA preemption, the Court will briefly address Gilday's state law claim of wrongful termination. Indiana follows the doctrine of employment at will, under which employment may be terminated by either party at will, with or without reason. Indiana courts have repeatedly held that they are disinclined to adopt broad and ill-defined exceptions to this doctrine. *Baker v. Tremco Inc*., 917 N.E.2d 650, 653 (Ind. 2009); *Orr. v. Westminster Village N., Inc.,* 689 N.E.2d 712, 717 (Ind. 1997). The Indiana Supreme Court has recognized a narrow, "tightly defined" exception to the at-will doctrine where an employer fires an employee "for refusing to commit an illegal act for which [s]he would be personally liable." *McClanahan v. Remington Freight Lines, Inc.*, 517 N.E.2d 390, 393 (Ind. 1988).

Even construing every inference in Gilday's favor, at most she is alleging that she questioned or investigated the propriety of continuing insurance coverage for Nerney and Gordon. The Court agrees that Gilday's difference of opinion with respect to coverage for Nerney and Gordon during their notice periods and her "investigation" do not constitute a "refusal to act" as required for a wrongful termination under *McClanahan.*

The plaintiff must do more than claim she was terminated for questioning the legality of an employer's acts, complaining about that conduct, or reporting or threatening to report alleged illegal activity. *See*, *e.g., Meyers v. Meyers*, 861 N.E.2d 704, 707 (Ind. 2007). Here, Gilday took no act, did not indicate unwillingness to do, accept, give, or allow. Gilday simply disagreed with the interpretation of the insurance policies' benefits. The benefits continued, as did Gilday's

employment, and Gilday did not act. Therefore even if examined under the Wrongful Termination analysis, the Court does not find that the evidence supports the claim. Therefore, the Defendant's Motion for Summary Judgment on Gilday's wrongful termination claim is **GRANTED**.

**Outstanding Issues**

Because Summary Judgment has been granted in full, Title VII compensatory and punitive damages cap, and ICGL liability need not be addressed.

## V. <u>CONCLUSION</u>

For the reasons noted herein, Defendant's Motion for Summary Judgment [Dkt. 78] is **GRANTED** and a separate judgment shall enter in favor of Defendants. Plaintiff's Motion to Strike [Dkt. 90] is **GRANTED** in part and **DENIED** in part. The pending motion [Dkt.157] is **DENIED** as moot.

SO ORDERED:    03/04/2011

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution attached.

Distribution to:

**Anne L. Cowgur**
BINGHAM MCHALE LLP
acowgur@binghammchale.com,dlawyer@binghammchale.com

**Duane R. Denton**
BINGHAM MCHALE LLP
rdenton@binghammchale.com,disom@binghammchale.com

**Frederick D. Emhardt**
PLEWS SHADLEY RACHER & BRAUN
emhardt@psrb.com,kblack@psrb.com

**James K. Gilday**
GILDAY DONAHOE & IRVIN PC
jgilday@gdilegal.com,acrum@gdilegal.com

**Brianna J. Schroeder**
PLEWS SHADLEY RACHER & BRAUN
bschroeder@psrb.com,jbowman@psrb.com

**Katherine E. Taylor**
PLEWS SHADLEY RACHER & BRAUN
ktaylor@psrb.com

**Jeffrey A. Townsend**
PLEWS SHADLEY RACHER & BRAUN
jtownsend@psrb.com,kblack@psrb.com